UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CAMELOT SI, LLC,

                              Plaintiff,

              - against -

THREESIXTY BRANDS GROUP LLC
f/k/a 360 HOLDINGS II-A LLC and
MERCHSOURCE, LLC,

                              Defendants.

**OPINION & ORDER**

21 Civ. 8232 (ER)

RAMOS, D.J.:

Camelot SI, LLC brings this action against ThreeSixty Brands Group LLC and

MerchSource LLC, alleging that defendants infringed upon Camelot's exclusive e-commerce

rights to the SHARPER IMAGE brand.  Doc. 1.  Pending before the Court is ThreeSixty's partial

motion to dismiss for failure to state a claim.  Doc. 19.  For the reasons set forth below, the

motion is GRANTED.

I.        BACKGROUND[1]

          a.  **The Manufacturing License Agreement**

          Since 2009, Camelot, a limited liability company based in Michigan, has been operating

as licensee of THE SHARPER IMAGE and SHARPER IMAGE trademarks and logos (the

"Trademarks").  ¶¶ 1, 7.

          On August 14, 2013, Camelot and then-licensor, Icon NY Holdings, LLC ("Icon"),

entered into a manufacturing agreement (the "Manufacturing License Agreement"), whereby

---

[1] The following facts are based on the allegations in the first amended complaint ("FAC"), which the Court accepts
as true for the purposes of the instant motion.  Unless otherwise noted, citations to "¶ __" refer to the FAC, Doc. 40.

Icon granted Camelot a non-exclusive license to manufacture and source-manufacture

SHARPER IMAGE branded products.  ¶ 9; *see* Doc. 41.  In pertinent part, the Manufacturing

License Agreement provides:

> Subject to the terms and conditions of this Agreement, [Icon] hereby grants to
> [Camelot] a non-exclusive license solely throughout the Territory to use the
> Licensed Mark in connection with the manufacture, advertising, promotion,
> marketing, distribution and sale solely of (i) Products approved by [Icon] for use
> by [Camelot] at retail (the "Retail Products") solely via the website
> "sharperimage.com", the Sharper Image catalogue and [Camelot]-owned retail
> outlets (collectively, the "Approved Retail Channels") and (ii) with [Icon]'s
> express written consent on a case-by-case basis, Products approved by [Icon] for
> use by [Camelot] at wholesale (the "Wholesale Products") solely to such accounts
> as [Icon] approves in writing (the "Approved Wholesale Channels" and, together
> with the Approved Retails Channels, the "Approved Accounts") pursuant to this
> Agreement; provided, however, that [Camelot] may only manufacture, advertise,
> promote, market, distribute and sell any given Product if [Icon] determines, in its
> sole discretion, that the quality of such Product is at least equivalent to the quality
> of the same or similar Product as it is being produced by [Icon]'s other licensee(s)
> for such Product.

¶ 10.  Additionally, the Manufacturing License Agreement provides that:

> If [Camelot] otherwise fails to perform any of the terms, conditions, agreements
> or covenants in this Agreement on its part to be performed or takes any action, or
> fails to take any action, which action or omission is materially harmful to [Icon],
> and if (i) such default or harm is not curable, or (ii) such default or harm is
> curable but continues uncured for a period of twenty (20) days after notice thereof
> has been given to [Camelot] by [Icon], then [Icon], at its sole election, may
> terminate this Agreement forthwith by notice to Licensee.

¶ 66.

**b.  The Purchase Agreement**

The following year, on June 30, 2014, Camelot and Icon entered into a Website and

Catalog Rights Purchase Agreement (the "Purchase Agreement").  ¶ 11; *see* Doc. 42.  At that

time, the Sharper Image brand was bankrupt, and "[m]any . . . customers were angry [as t]hey

had invalid gift cards or products that could not be exchanged or returned."  ¶ 25.

2

The Purchase Agreement replaced an earlier 2009 license and distribution agreement between the parties and rendered the Manufacturing License Agreement "a separate, stand-alone agreement[.]"  ¶¶ 11–12.  Pursuant to the Purchase Agreement, the Manufacturing License Agreement would "solely" govern "the manufacture and sale of goods and products branded with the Trademarks," while the Purchase Agreement would separately govern "the branding of E-Commerce Services and Catalog Services."  ¶ 12.

The Purchase Agreement defines "E-Commerce Services" as "[r]etail services in the form of online retail services offered via the [w]ebsite [SharperImage.com], Social Media, other digital retail sales platforms similar to the [w]ebsite and derivations therefore that are later developed for the purposes of offering retail sales direct to consumers, in each of the foregoing cases, branded under the SHARPER IMAGE brand and the Trademarks[.]"  ¶ 15.  The Purchase Agreement granted Camelot a license to use the Trademarks in e-commerce; it provides in pertinent part:

> Subject to the terms and conditions set forth herein, [Icon] hereby grants to [Camelot] . . . the exclusive, personal non-transferable, non-assignable (except in accordance with [§] 14(b)(vi)), non-sublicensable right and license to use the Trademarks during the [specified term], solely in connection with the E-Commerce Services only in the [specified e-commerce territory . . .], and for no other products or services.  The foregoing license shall allow [Camelot] to reformat the [w]ebsite as an online "app" and to use [s]ocial [m]edia . . ., subject however, to any existing [c]ontract involving the SHARPER IMAGE brand, the rights of licensees in the [e]xcluded [j]urisdictions, the rights of [Icon']s other licensees (both current and future) offering SHARPER IMAGE branded products through non-SHARPER IMAGE branded online retail sales or marketing platforms similar to the E-Commerce Services and the other terms set forth herein.  In this regard, the license granted by [§] 3(a)(i) is nonexclusive for "apps" and [s]ocial [m]edia to the extent indicated in the previous sentence.  Additionally, on a non-exclusive basis, and in accordance with the Manufacturing Addendum, [Camelot] may continue to offer SHARPER IMAGE branded products in the E-Commerce Territory at retail directly to consumers through third party online retail sales platforms (e.g., Amazon and e-Bay); provided that it is acknowledged and agreed by [Camelot] that [Icon]'s other licensees (both current and future) offering SHARPER IMAGE branded products through non-

SHARPER IMAGE branded online retail sales or marketing platforms may continue to do so notwithstanding the rights granted herein to [Camelot].

¶ 14.

The Purchase Agreement also stipulates that the contracting parties must use "commercially reasonable efforts to protect the good name and goodwill associated with the Trademarks and the SHARPER IMAGE brand."  ¶ 16.  This provision further stipulates that the parties must "support the SHARPER IMAGE brand by refraining from, and using commercially reasonable efforts to cause their [a]ffiliates or licensees to refrain from, conduct that is illegal, offensive or would tend to subject the other Party . . . to ridicule, contempt, controversy, embarrassment, or scandal."  *Id.*  Specifically,

> [n]either Party may use, nor shall it permit its [a]ffiliates or licensees to use, the Trademarks in any way that could (i) negatively reflect upon, dilute or otherwise tarnish the SHARPER IMAGE brand or the Trademarks, or (ii) compromise or reflect unfavorably upon the good name, goodwill, reputation or image of the other Party.  For the avoidance of doubt, these obligations specifically include any content or messaging distributed through Social Media.

*Id.*  Lastly, the Purchase Agreement provides:

> At any time and from time to time after the [effective date of this agreement, Icon] shall, for no further consideration and at [Camelot]'s sole cost and expense, execute and deliver all such other further documents and perform all further acts that may be reasonably requested by [Camelot] to effectuate the terms and provisions of this Agreement.

*Id.* at 10.[2]  For more than a decade, Camelot has been the only party authorized to sell SHARPER IMAGE branded products through SHARPER IMAGE branded online retail sales or marketing platforms.  ¶ 18.  Camelot has operated the SHARPER IMAGE branded website (i.e., SharperImage.com) since 2009 and has owned it since 2014.  ¶ 19.

---

[2] Both the Manufacturing License Agreement and the Purchase agreement provide that Icon is the owner of the goodwill attached to the Trademarks.  *See* Doc. 41 at 8–9; Doc. 42 at 13 (same).

### c.   Amazon Merchant Agreement

On September 29, 2010, Camelot entered into a Merchants@Amazon.com Program

Agreement (the "Amazon Merchant Agreement") with Amazon.com, which permits Camelot to

sell on Amazon's e-commerce platform.  ¶ 20; *see* Doc. 40-3.  The Amazon Merchant

Agreement provides that

> Amazon will list [Camelot's] Products for sale on . . . Amazon.com . . . and
> conduct merchandising and promotion of [Camelot's p]roducts as determined by
> Amazon . . . .  [Camelot] acknowledges and agrees that Amazon may implement
> mechanisms that rate and/or allow [customers] to rate and provide feedback
> regarding [Camelot's] Products, [Camelot] and/or [Camelot's] performance and
> [Camelot] consents to Amazon making such ratings and other feedback publicly
> available.

¶ 22.  As a result, Amazon has been listing Camelot products since 2012.  ¶ 20.  Section 11.1

further grants Amazon the sole authority to

> determine the content, appearance, design, functionality and all other aspects of
> the Amazon.com site (including the right to . . . remove and alter the content . . .) .
> . . and to delay or suspend listing of, or to refuse to de-list, or to require [Camelot]
> not to list any or all products in its sole discretion.

Doc. 40-3 at 7.

### d.   Camelot's Efforts to Improve the SHARPER IMAGE Brand

Since purchasing Sharper Image's e-commerce business, Camelot has expended

tremendous efforts to rebuild the previously failing brand, including by:  spending $168 million

to market and promote the brand; advertising heavily on social media (appearing in individual

advertisements more than 300 million times); dedicating significant capital to overcoming the

challenges posed by Sharper Image's bankruptcy; delivering 1.5 billion emails to

SharperImage.com email subscribers; mailing more than 210 million catalogs to consumers'

homes; staffing a call center with more than 100 agents during peak season to take calls from

SharperImage.com customers; and answering thousands of calls from disgruntled customers.

*See* ¶¶ 24, 26–27, 29.  Through these efforts, Camelot has revived the SHARPER IMAGE brand and regained consumer confidence.  ¶ 34.

### e.  ThreeSixty's Improper Conduct

In December 2016, ThreeSixty (then doing business as 360 Holdings II-A LLC) acquired the Purchase Agreement and Manufacturing License Agreement (the "Agreements") from Icon.[3] ¶ 34.  ThreeSixty is the current owner of the SHARPER IMAGE brand and the Trademarks.[4] *See* Doc. 49.  Despite ThreeSixty's agreement to offer SHARPER IMAGE branded products only through *non*-SHARPER IMAGE branded e-commerce services, *see* Doc. 41 at 7, and in direct violation of Camelot's exclusive license of the Trademarks in connection with e-commerce services, ThreeSixty is operating several SHARPER IMAGE branded online retail sales and marketing platforms, and has launched a second brand known as "Sharper Tomorrow." ¶ 34.

ThreeSixty has established—and maintains absolute control over—a SHARPER IMAGE branded storefront on Amazon that sells SHARPER IMAGE branded products (the "Storefront").  ¶ 39.  The Storefront operates as a sub-website within Amazon's website and purports to be "the official home of all things SHARPER IMAGE."  ¶ 40.  ThreeSixty has not shared any information or privileges related to the Storefront with Camelot.  *Id.*  From the

---

[3] 360 Holdings II-A LLC changed its name to ThreeSixty in February 2017.  ¶ 36.

[4] Federal Rule of Evidence 201 provides that a court may take judicial notice of facts "generally known within the trial court's territorial jurisdiction" or that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned" "at any stage of the proceeding."  Fed. R. Evid. 201.  Courts regularly take notice of the content of trademark registrations as a matter of public record.  *See Telebrands Corp. v. Del Labs., Inc.*, 719 F. Supp. 2d 283, 287 n.3 (S.D.N.Y. 2010) ("The Court may properly take judicial notice of official records of the United States Patent and Trademark Office and the United States Copyright Office."); *Lopez v. Adidas Am., Inc.*, No. 19 Civ. 7631 (LJL), 2020 WL 2539116, at *6 (S.D.N.Y. May 19, 2020) (taking judicial notice of federal trademark registrations on motion to dismiss); *Hesse v. Godiva Chocolatier, Inc.*, 463 F. Supp. 3d 453, 462 (S.D.N.Y. 2020) (same).  Accordingly, pursuant to Defendants' request, the Court takes judicial notice of U.S. Patent and Trademark Office certificates that show ThreeSixty as the holder of the Trademarks.  *See* Doc. 49.

Storefront, consumers are told to "[s]hare this page with [their] friends" and to "Follow []
Sharper Image," meaning ThreeSixty.  *Id.*  A link to the Storefront, entitled "Visit the Sharper
Image Store," is featured on ThreeSixty's SHARPER IMAGE branded product pages, as well as
on *Camelot*'s SHARPER IMAGE branded product pages.  ¶¶ 41–42.  Accordingly, consumers
interested in Camelot's licensed SHARPER IMAGE products are being directed to the
competing Storefront to buy goods from ThreeSixty.   ¶ 43.

     In addition to the Storefront, ThreeSixty has also registered a similar variant of the
SHARPER IMAGE trademark, "Sharper Tomorrow," as a domain name, SharperTomorrow.com
(the "Sharper Tomorrow Website").  ¶ 44.  The Sharper Tomorrow Website is operated by
MerchSource, a subsidiary of ThreeSixty, and sells ThreeSixty's SHARPER IMAGE branded
goods.  ¶ 45.  On the Sharper Tomorrow Website, ThreeSixty claims the heritage of Sharper
Image:

> From the beginning in 1977, Sharper Image embraced the cutting edge and
> brought the best of tomorrow to people today.  That vision hasn't changed but it
> has evolved.  Today, Sharper Image goes beyond simple innovation.  To be
> clever.  Visionary.  Timeless.  Sharper Image products continue to create
> thoughtful and exciting ways to change your life – delivering experience you will
> remember today, tomorrow and Tomorrow's Tomorrow.

¶ 47.  The Sharper Tomorrow Website directs consumers to ThreeSixty's Storefront and retail
partners, and away from Camelot's site.  ¶ 48.

     Furthermore, ThreeSixty has also registered rival SHARPER IMAGE branded social
media accounts on Facebook, Twitter, Instagram, and other platforms under the username
"asharpertomorrow" (the "Social Media Accounts").  ¶ 50.  Each of the Social Media Accounts
claim the heritage of Sharper Image and direct consumers to the Sharper Tomorrow Website.  ¶
51.  Further blurring the lines between Sharper Tomorrow and Sharper Image, ThreeSixty

includes the following hashtags in its Twitter and Facebook posts:  #SharperImage and #asharpertomorrow.  ¶¶ 52–53.

As evidence of customers' confusion as to the origin of ThreeSixty's and Camelot's respective goods, Camelot claims that during the 2021 holiday season alone, it received hundreds of phone calls regarding ThreeSixty's SHARPER IMAGE branded products.  ¶ 54.

### e.  Camelot's Correspondence with ThreeSixty

On June 21, 2021, ThreeSixty sent a letter to Camelot, raising questions about Camelot's use of the Trademarks in e-commerce.  ¶ 59.  Camelot, in the process of investigating ThreeSixty's questions, discovered that *ThreeSixty* was the one engaging in wrongful conduct.  ¶ 60.  Accordingly, on July 21, 2021, Camelot sent ThreeSixty a notice of default, listing ThreeSixty's breaches of various provisions of the Agreements[5] and demanding that it cure its ongoing breaches within thirty days.  ¶ 63.  Approximately two months later, on September 15, 2021, ThreeSixty responded to Camelot's notice of default, disagreeing with Camelot's allegations.  ¶ 65.  ThreeSixty also included its *own* notice of breaches and demanded that Camelot cure its breaches or else ThreeSixty would terminate the Agreements.[6]  *Id.*

The following month, on October 4, 2021, ThreeSixty reported Camelot to Amazon for "listing counterfeit products," which caused Amazon to remove products that Camelot listed for sale and to place Camelot's seller account "under review."  ¶ 68.  The next day, on October 5, 2021, Camelot wrote to ThreeSixty, detailing the actions Camelot was taking to address the issues raised in ThreeSixty's September 15, 2021 response.  ¶ 70.  Camelot cured every one of

---

[5] *See* Doc. 40-4 at 7–8 (alleging that ThreeSixty—by operating the Storefront, the Sharper Tomorrow website, and SHARPER IMAGE branded social media accounts—was violating the Agreements).

[6] *See* Doc. 40-5 at 2–3 (alleging that Camelot was violating the Agreements by, for example:  identifying itself as "Sharper Image" on third-party websites; maintaining "SHARPERIMAGE.COM" as an assumed name; and selling, advertising, or offering for sale unapproved SHARPER IMAGE branded products).

the breaches alleged by ThreeSixty; but even so, on November 29, 2021, ThreeSixty sent a letter

to Camelot, purporting to terminate the Manufacturing License Agreement.  ¶¶ 70–71.  The

Termination Letter did not allege any additional breaches of the Manufacturing License

Agreement, nor did it specify the basis for the purported termination of the agreement.  ¶ 72.  On

December 10, 2021, Camelot responded to ThreeSixty's Termination Letter, notifying

ThreeSixty that it did not have the right to terminate the Manufacturing License Agreement.  ¶

73.

### f.  Procedural History and Jurisdiction

Meanwhile, on October 5, 2021, Camelot brought this action against ThreeSixty and

MerchSource.  Doc. 1.  On January 14, 2022, Camelot filed the FAC, alleging unfair competition

pursuant to § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and New York common law claims

of unfair competition and tortious interference.  Doc. 40.  Against only ThreeSixty, Camelot

brings suit for breach of contract, specific performance, and unjust enrichment.  All of Camelot's

claims arise from ThreeSixty's use of the Trademarks in e-commerce.  *Id.*

The FAC states that this Court has federal question jurisdiction over Count I, which

Camelot brings pursuant to the Lanham Act, and supplemental jurisdiction over Counts II

through IX, which allege state common law causes of action, pursuant to 28 U.S.C. § 1367.[7]

On February 4, 2022, Defendants filed ten counterclaims:  (1) breach of contract, (2)

trademark infringement, (3) false affiliation, (4) false advertising, and (5) trademark dilution

pursuant to the Lanham Act; (6) unfair business practice pursuant to N.Y. Gen. Bus. Law § 360-

1; (7) declaration for termination of the Manufacturing License Agreement; (8) declaration for

---

[7] The FAC does not allege diversity jurisdiction.

termination of the Purchase Agreement; (9) declaration of non-infringement; and (10) that they did not breach the Agreements.  *See* Doc. 46.

Defendants state that the Court has federal question jurisdiction over its Lanham Act claims and supplemental jurisdiction over its remaining state law counterclaims.  *Id.* ¶ 12.  In addition, Defendants argue that this Court also has diversity jurisdiction because the parties' citizenship is diverse and the amount in controversy exceeds $75,000, exclusive of interest and costs.[8]  *Id.*  Lastly, Defendants contend that the Court has jurisdiction over ThreeSixty's related state and common law claims pursuant to 28 U.S.C. §§ 1338 and 1367.  *Id.*

Also on February 4, 2022, Defendants filed a motion to dismiss the following five causes of action:  Count I (§ 1125(a) unfair competition), Count II (common law unfair competition), Count III (tortious interference with prospective economic advantage), Count IV (tortious interference with contract), and Count VIII (specific performance).  Doc. 47.

On April 20, 2022, Camelot filed a motion to dismiss Counts IV through X of Defendants' counterclaims.  Doc. 62.[9]

## II.    Legal Standard

### a.   Rule 12(b)(6)

---

[8] The plaintiff and each of the two defendant companies are LLCs.  The citizenship of an LLC is determined by the citizenship of each of its members.  *See Bayerische Landesbank, New York Branch v. Aladdin Capital Management LLC*, 692 F.3d 42, 49 (2d Cir. 2012).  Defendants, in their counterclaims, state that the sole member of Camelot SI LLC is Camelot Venture Group, LLC, a limited liability corporation that (like Camelot SI, LLC) is organized under the laws of Michigan, with a principal place of business in Michigan.  But this does not end the diversity inquiry because no information is provided as to who the members of Camelot Venture Group, LLC are.  Defendants also claim that the sole member of ThreeSixty Brands Group LLC is 360 Holdings III Corp., which (like ThreeSixty Brands Group LLC) is a corporation organized under the laws of Delaware, with a principal place of business in California.  But Defendants do not name in their counterclaims the member or members of MerchSource LLC.  *See* Doc. 46 at 3.

[9] This motion is fully submitted and will be decided by separate opinion.

When ruling on a motion to dismiss pursuant to Federal Rule of Civil Procedure ("FRCP") 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). However, the Court is not required to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter … to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

## III.   Discussion

### a.   Counts I & II:  Federal and State Common Law Unfair Competition

"To state a claim under the Lanham Act for trademark infringement, unfair competition, and false designation of origin, a plaintiff must establish that:  (1) [plaintiff] owns a valid mark entitled to protection under the Lanham Act; (2) defendant used the protected mark in commerce, without plaintiff's consent; and (3) defendant's use of that mark is likely to cause consumers confusion as to the origin or sponsorship of the defendant's goods." *Lopez v. Nike, Inc.*, 2021 WL 128574, at *4 (S.D.N.Y. Jan. 14, 2021) (emphasis added) (internal quotation marks and citations omitted). The "elements of an unfair competition claim under New York law are identical to the elements of an unfair competition claim under the Lanham Act, save that the plaintiff must also show bad faith by the infringing party." *Fischer v. Forrest*, 286 F. Supp. 3d

11

590, 617 (S.D.N.Y. 2018), *aff'd*, 968 F.3d 216 (2d Cir. 2020) (internal quotation marks and citations omitted).

Defendants contend that Counts I and II of the FAC fail because Camelot cannot establish the first element of a Lanham Act claim (i.e., that it owns a valid commercial interest in the Trademarks) or the second element (i.e., that that there is a likelihood of consumer confusion surrounding ownership of the mark).  *See* Doc. 48 at 11.  The Court agrees.  Although Camelot alleges a contract right against ThreeSixty, it does not claim to possess the requisite commercial interest in the Trademarks to support an unfair competition lawsuit against ThreeSixty as the owner of the Trademarks, or authorized licensee, MerchSource, under federal or common law.  Furthermore, absent such interest, there can be no consumer confusion as to the ownership of the Trademarks.

The Second Circuit's decision in *Twentieth Century Fox Film Corporation v. Marvel Enterprises, Inc.,* 277 F.3d 253, 259 (2d Cir. 2002)—which Camelot acknowledges concerned "underlying facts [] similar to those alleged here"—is controlling.  *See* Doc. 51 at 13.  There, Marvel owned trademarks in the "X-Men*"* comic book and characters.  Fox, a film studio, licensed from Marvel the right to make a movie, *X-Men*.  *Id.* at 256.  Marvel thereafter created a television series entitled *Mutant X*, which Fox believed infringed the rights it had licensed from Marvel.  *Id.*  Fox sued Marvel for "unfair competition and/or false designation of origin under [§] 43(a) of the Lanham Act," and common law unfair competition.  *Id.* at 259.

Fox argued that Marvel's television series violated its rights in the *X-Men* motion picture because the concept, premise, and characters were "virtually identical," and Marvel's "knock-off" product cheapened the value of Fox's film and marketing opportunities, led customers to associate *Mutant X* with *X-Men*, and diminished the market for Fox's planned sequels to *X-Men*.

*See id.* at 256.  The district court dismissed the unfair competition claim premised upon false designation of origin.  It reasoned that Marvel, the owner of the marks, is the "origin" of the series (and the film) within the meaning of trademark law (i.e., the source of the goodwill inhering in the trademarks that Marvel licensed to Fox).  *Id.* at 259 (internal quotation marks omitted).  Because Fox did not own the marks, it could "claim no impairment of goodwill in the X-Men property associated with the X-[M]en trademark."  *Id.* at 259 (internal quotation marks omitted).  Accordingly, the Second Circuit affirmed the FRCP 12 dismissal.[10]

Camelot, like Fox, cannot claim any impairment in the goodwill associated with the Trademarks.  Indeed, the plain language of the Agreements shows the opposite:  that all goodwill inures to ThreeSixty.  *See* Doc. 41-1 at § 12.2 (providing that "[ThreeSixty] is the owner of all right, title and interest in and to the [Trademarks] . . . in any form or embodiment thereof  and is also the owner of the goodwill attached or that shall become attached to the [Trademarks] in connection with the business"); Doc. 42 at 13 (same); 15 U.S.C. § 1055 (use of a mark inures to the benefit of the registrant).

Camelot, however, argues that the plain language of the Lanham Act § 43(a) is not limited to trademark infringement but rather allows parties to bring unfair competition claims where an unfair business practice is likely to cause confusion among consumers.  *See* Doc. 51 at 12–13.  In support of that proposition, Camelot cites *Mastercard Int'l Inc. v. Sprint Commc'ns Co. L.P.*, No. 94 Civ. 1051 (JSM), 1994 WL 97097, at *3 (S.D.N.Y. Mar. 23, 1994), *aff'd sub nom. MasterCard Int'l v. Sprint Commc'n*, 23 F.3d 397 (2d Cir. 1994).  But there, the court found only

---

[10] The Court noted, however, that "[a] licensee is not without recourse under section 43(a) of the Lanham Act if its licensor makes false claims to promote a competing product (or falsely disparages the licensee's product).  The licensor's sole enjoyment of the goodwill in the licensed mark does not entitle it to make false claims to promote its own product, allegedly to the detriment of its licensee.  Trademark licensees have been permitted to sue competitors under section 43(a)."  *Twentieth Century Fox*, 277 F.3 at 259–260 (collecting cases).

that the plaintiff had standing to bring a *false advertising* claim against a sub-licensee under the Lanham Act. This Court has already noted that § 43(a) permits licensees to bring false advertising claims against licensors and authorized licensees. Camelot, however, does not allege false advertising. For that reason, alone, *Mastercard* is not analogous.

Moreover, contrary to Camelot's interpretation, courts have made clear that "under [§] 43 of the Act, there is no specific [f]ederal cause of action for unfair competition." *Sussman-Automatic Corp. v. Spa World Corp*, 15 F. Supp. 3d 258, 272 (E.D.N.Y. 2014) (citing *Pot Luck, L.L.C. v. Freeman,* 06 Civ 10195 (DAB), 2009 WL 693611, at *4 (S.D.N.Y. Mar. 10, 2009) (internal quotation marks omitted). "Instead unfair competition under the Lanham Act is a category of claims consisting primarily of causes of action for false designation of origin and false advertising." Accordingly, Camelot cannot escape the Lanham Act's ownership interest requirement.[11]

Additionally, case law makes clear that as owner of the Trademarks, ThreeSixty is the sole "source" that consumers associate with Camelot or MerchSource's use of the marks. Thus, there simply can be no confusion as to their origin. *See, e.g.*, *G & F Licensing*, 2010 WL 2900203, at *4 (granting motion to dismiss where licensee asserted false designation of origin claim against licensor "because the origin of the products bearing the licensed marks, within the meaning of trademark law . . . [was defendant], the owner of the marks."); *Silverstar Enters., Inc. v. Aday*, 537 F. Supp. 236, 241–42 (S.D.N.Y. 1982) (dismissing complaint filed by exclusive licensee against licensor and trademark registrant); *City-Core Hospitality, LLC v. Palmer*, 2018 WL

---

[11] For this same reason, the Court rejects Camelot's contention that *Twentieth Century Fox* is "not analogous because the court treated Fox's unfair competition claim as a false designation of origin claim." *See* Doc. 51 at 13–14.

398257, at *3 (N.D. Cal. Jan. 12, 2018) (granting motion to dismiss a § 1125(a) claim filed by exclusive licensee against another licensee because the "[p]arties that have a valid license to use a mark and that use the mark in accordance with the license [were] merely exercising the rights that have been granted by the licensor.")[12] *see also* 3 THOMAS J. MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 4:6 (5th ed. 2019), § 18:44.50 (providing that an "[e]xclusive licensee cannot sue the licensor for trademark infringement" and noting that in cases like *Twentieth Century Fox*, "licensee's remedy is for breach of contract, not trademark infringement"); *id* § 32:12 (Exclusive licensees "should not be allowed to sue another licensee whose right to use flows from the same trademark owner.  In such cases, the exclusive licensee's remedy is to sue its licensor for breaching the contractual promise of exclusivity.").

Because Camelot has failed to meet two of the essential elements necessary to sustain a claim under the Lanham Act—and because the elements of an unfair competition claim under New York law are the same as the elements of an unfair competition claim under the Lanham Act—Counts I and II are hereby dismissed.[13]

### b.  Count III:  Tortious Interference with Prospective Economic Advantage

To state a claim for tortious interference under New York law, a plaintiff must allege "(1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the

---

[12] Camelot attempts to distinguish these cases because they involve false designation of origin claims and not unfair competition claims.  *See* Doc. 51 at 15.  However, as already noted, "there is no specific [f]ederal cause of action for unfair competition" under the Lanham Act.  Therefore, Camelot cannot dodge the requirement to show consumer confusion as to the origins of the goods.

[13] The Court need not undertake the bad faith analysis required by New York law because two of the essential elements of a common law unfair competition claim are not met.

relationship." *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 400 (2d Cir. 2006) (internal

quotation marks and citations omitted).  Courts dismiss tortious interference claims that fail to

allege any one of these elements.  *See, e.g..*, *Fifth St. Fin. Corp.*, 2013 WL 3757037, at *4–6

(dismissing tortious interference claim where elements were inadequately pled); *Gianni Versace,*

*S.p.A. v. Versace*, 2003 WL 470340, at *2 (S.D.N.Y. Feb. 25, 2003) (same).  Here, Defendants

argue that Camelot has failed to allege any of these elements.  *See* Doc. 48 at 17.

Defendants assert that the first element is not met because the FAC fails to name a

specific business relationship with which Defendants interfered.  *See id.* at 17–18.  The Court

agrees.  Courts dismiss tortious interferences claim where a plaintiff fails to "identif[y a] specific

business relationship [] with which [the defendant is alleged to have] interfered." *Mumin v. Uber*

*Technologies*, 239 F. Supp. 3d 507 (E.D.N.Y 2017).  A plaintiff's "[g]eneric references to . . .

customers," *id.*, or to "existing customers, and major companies with which it has strong

business relationships," does not suffice, *Plasticware, LLC v. Flint Hills Resources, LP*, 852 F.

Supp. 2d 398, 402 (S.D.N.Y 2012) (collecting cases).  *See also AIM Int'l Trading, L.L.C. v.*

*Valcucine S.p.A., IBI, L.L.C.*, No. 02 Civ. 1363 (PKL), 2003 WL 21203503, at *6  (S.D.N.Y.

May 22, 2003) (noting "[a] properly pleaded complaint . . . must allege relationships with

specific third parties with which the respondent interfered"); *Mastercraft Decorators, Inc. v.*

*Orlando*, 356 F. Supp. 3d 259, 267 (W.D.N.Y. 2018) (dismissing allegations that defendant

contacted, solicited, and obtained orders from "customers").

Here, the FAC alleges that Defendants have repeatedly mis-directed hundreds of

customers attempting to purchase Camelot products on Amazon to the Sharper Tomorrow

Website and the Storefront, ¶¶ 38–42, 62.  The FAC further contends that ThreeSixty's social

media accounts similarly misdirect consumers seeking Camelot's products to the Sharper

Tomorrow Website.  ¶¶ 50–53, 61.  As evidence of customers' confusion, Camelot points to the fact that it purportedly received hundreds of phone calls regarding ThreeSixty's products during the 2021 holiday season.  ¶ 54.

While Camelot is correct that the FAC contains "some 20 paragraphs" describing its relationships, it nonetheless fails to identify any concrete relationship with a particular consumer. Doc. 51 at 19.  Thus, the FAC's allegations are highly analogous to those made in the complaints dismissed in *Mumin* and *Plasticware*, where courts dismissed on the basis that generic references to customer relationships do not suffice.  Accordingly, the Court finds that Camelot has not alleged the first element of a tortious interference claim.  This deficiency is by itself fatal to Count III.  The Court, however, also finds that Camelot has failed to plead the third element of the claim:  that Defendants acted solely out of malice or used wrongful means.

The New York Court of Appeals has made clear that "as a general rule," to succeed on a tortious interference claim the "defendant's conduct must amount to a crime or an independent tort," because "[c]onduct that is not criminal or tortious will generally be lawful and thus insufficiently culpable to create liability with interference with prospective contracts or other non[-]binding economic relations."  *Carvel Corporation v. Noonan*, 3 N.Y.3d 182, 190 (2004). An exception exists where a defendant "engages in conduct for the sole purpose of inflicting harm on plaintiff[]" and not for "normal economic self-interest."  *Id.* (internal quotation marks and citations omitted).  The court in *Carvel* did not "decide . . . whether any other exception to the general rule exists—whether there can ever be other instances of conduct which, though not a crime or tort in itself, was so culpable . . . that it could be the basis for a claim of tortious interference with economic relations."  *Id.* at 190–91 (internal quotation marks and citations omitted).  The court noted, however, that such culpability could exist where the defendant has

17

employed "wrongful means," such as "physical violence, fraud or misrepresentation, [and] civil suits and criminal prosecutions." *Id.* at 191 (quoting *Guard-Life Corp v. S. Parker Hardware Mfg. Corp*, 50 N.Y.2d 183 (1980)); *see also Frank Importing Co., Inc. v. Beam Inc.*, 998 F. Supp. 2d 193 (S.D.N.Y. 2014) (noting "not just *any* misrepresentation is sufficient to state a claim.") (citing *Friedman v. Coldwater Creek, Inc.*, 321 Fed.Appx. 58, 60 (2d Cir. 2009) ("The New York Court of Appeals has never held that *any* misrepresentation to a third party is sufficient to sustain a claim for tortious interference with prospective economic relations.")).

Here, Camelot asserts that Defendants' "misrepresentations to consumers is enough to establish interference through wrongful purpose." Doc. 51 at 19.  To support that argument, Camelot cites *Sprint Solutions, Inc. v. Sam*, where the court deemed sufficient a defendant's "regular[] and systemic[] misrepresent[ations] to [p]laintiffs that the [goods] at issue were being acquired for a legitimate purpose." 206 F. Supp. 3d 755, 763 (E.D.N.Y. 2016).  That case, however, involved "misrepresent[ations] to *plaintiffs*"—not to customers. *Id.* (emphasis added). What's more, the court there found that the plaintiffs alleged facts to "sufficiently plead a claim for common law fraud and fraudulent misrepresentation." *Id.* at 764.  Defendants' conduct thus fell squarely within the general rule set forth by the *Carvel* court, unlike the conduct alleged here. *See Carvel*, 3 N.Y.3d at 190.  For these reasons, *Sprint* is not analogous.[14]

Camelot, moreover, cannot rely on the *Carvel* exception.  Nowhere does the FAC allege that the Defendants acted *solely* out of malice.  Even construing the facts in the light most favorable to Camelot, economic self-interest is at least *a* reason for Defendants' behavior. *See Carvel*, 3 N.Y.3d at 190.  Camelot also has not established that the "wrongful means" exception

---

[14] For similar reasons *Sidney Frank Importing Co. v. Beam Inc.* is not analogous; there, the court found "wrongful means" to exist because the plaintiff adequately pleaded that the defendant made fraudulent misrepresentations to specific entities.  998 F. Supp. 2d 193, 212 (S.D.N.Y. 2014).

should apply; as noted, the opinions relied upon by Camelot permitted the tortious interference claims to go forward only where the underlying complaints pleaded facts suggesting fraudulent misrepresentations, which the FAC does not do here.  Camelot has therefore not met the third element of a tortious interference claim.

For the reasons set forth above, Count III is dismissed.[15],[16]

### d.  Count IV:  Tortious Interference with a Contract

To state a claim under New York law for tortious interference with a contract, a plaintiff must allege "(1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third party's breach of the contract without justification; (4) actual breach of the contract; and (5) damages resulting therefrom."  *Kirch*, 449 F.3d at 401 (citing *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424 (1996)) (internal quotation marks omitted).

The New York Court of Appeals and Second Circuit have dismissed interference with contract claims where plaintiff has failed to plead actual breach by the third party.  *See, e.g.*, *Kirch*, 449 F.3d at 402; *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 589 (2d Cir. 2005) ("Absent a showing that Aetna's conduct ultimately led to a breach, Aniero's latest allegations cannot be read to state a proper claim for tortious interference."); *D'Andrea v. Rafla-Demetrious*, 146 F.3d 63, 66 (2d Cir. 1998) ("Because there was no breach of contract in the instant case, D'Andrea's tortious interference with contractual relations claim must fail."); *NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp., Inc.*, 87 N.Y.2d 614, 620 (1996) ("Ever since tortious

---

[15] In light of the Court's findings, it need not now consider whether the FAC adequately pleads Defendants' knowledge of the purported interference or whether Camelot suffered an injury.

[16] Defendants separately ask the Court to dismiss this claim as to MerchSource on grounds that Camelot does not allege any facts connecting MerchSource to the alleged interference.  *See* Doc. 58 at 15.  The Court declines to do so.  The FAC pleads that MerchSource operates Defendants' website, which purportedly plays a central role in interfering with Camelot's customer relationships.

interference with contractual relations made its first cautious appearance in the New York

Reports—decades after the seminal case *Lumley v. Gye*—our [c]ourt has repeatedly linked

availability of the remedy with a breach of contract.").  Moreover, *MMS Trading Company v.*

*Hutton Toys, LLC*, No. 20 Civ. 1360, 2021 WL 119394, at *2–3 (E.D.N.Y. Mar. 29, 2021) is

particularly instructive.  There, a plaintiff alleged that its competitor fraudulently filed a

complaint with Amazon that caused Amazon to remove the plaintiff's products.  *Id.* at * 2–3.

The court dismissed the plaintiff's claim on an FRCP 12 motion in part because it failed to plead

that an actual breach of its contract with Amazon occurred when Amazon removed the toy

seller's products.  *Id*. at *12–13.

Some courts, however, have found that a plaintiff need not plead actual breach to sustain

a contract interference claim.  Those cases have held that "tortious interference with contract

requires an allegation of either underlying breach or rendering contract performance impossible."

*Sudarsan v. Seventy Seven Energy Inc*., No. 17 Civ. 2342 (GBD) (GWG), 2018 WL 1088004, at

*8 (S.D.N.Y. Feb. 6, 2018); *Hersh v. Cohen*, 16 N.Y.S.3d 606, 609–10 (2d Dep't 2015) (holding

that the complaint sufficiently set forth a cause of action for tortious interference with contract

because it alleged defendant's intentional interference rendered contract performance

impossible); *Rockwell Glob. Cap., LLC v. Soreide L. Grp., PLLC*, 954 N.Y.S.2d 22, 23 (1st

Dep't 2012) (affirming that the lower court properly declined to dismiss a counterclaim for

tortious interference with a contract because defendant alleged that the instant action was meant

to render contract performance impossible); *Maison Lazard Et Compagnie v. Manfra, Tordella*

*& Brooks, Inc.*, 585 F. Supp. 1286 (S.D.N.Y. 1984) (The allegation that defendants "made it

impossible" for the plaintiff to "reap the full benefits" of a third-party contract, was enough to

plead the fourth element of contract interference.).

Camelot, who asks the Court to apply the "impossibility" approach, has failed to show any case in which the New York Court of Appeals or the Second Circuit has adopted that standard in lieu of the actual breach requirement.  Accordingly, this Court will apply the approach stated by the Court of Appeals in *NBT Bancorp Inc.* and adopted by the Second Circuit in *Aetna*, requiring actual breach.[17]

Here, a valid contract exists between Camelot and third-party, Amazon. Doc.  40-3.  The FAC also alleges that in October 2021, ThreeSixty reported Camelot to Amazon for "listing counterfeit products," which "caused Amazon to remove products that Camelot had listed for sale and place Camelot's Amazon seller account 'under review.'"  ¶ 68.  This is the sole instance of breach suggested by the FAC.

The FAC does not, however, expressly allege that Amazon, by removing Camelot's products and placing it under review, breached their agreement.  As Defendants point out, that is likely because §11.1 of the Amazon Merchant Agreement grants Amazon the absolute authority to remove or alter content on its website.  *See* Doc. 40-3 at 7 (providing that Amazon may "remove and alter the content" on its site, including "suspend[ing] listing of, or . . . refus[ing] to list or . . . de-list[ing] . . . any or all products in its sole discretion"); *see also* Doc. 48 at 23.[18] Additionally, the FAC does not allege that MerchSource was at all involved in reporting Camelot

---

[17] The Court notes, however, that Camelot's claim also fails under the "impossibility" standard.  The FAC does not contain facts supporting the allegation that its performance under the contract was rendered impossible when ThreeSixty reported Camelot to Amazon for listing counterfeit products.  ¶ 102.  Indeed, Camelot pleads the opposite because it alleges that it still sells products on Amazon to this day.  ¶ 23.

[18] Camelot does not discuss § 11.1 in its opposition.  *See generally* Doc. 51.

to Amazon; the allegation is solely made with respect to ThreeSixty.  In light of the above, Count IV is dismissed.[19]

### e.  Count VIII:  Specific Performance

"Under New York law, specific performance may be granted when (1) a valid contract exists; (2) the plaintiff has substantially performed under the contract, and is willing and able to perform any remaining obligations; (3) the defendant is able to perform its contractual obligations; and (4) the plaintiff has no adequate remedy at law."  *Alexander Interactive, Inc. v. Adorama, Inc*., No. 12 Civ. 6608 (PKC) (JCF), 2014 WL 113728, at *4 (S.D.N.Y. Jan. 13, 2014).

Here, Camelot seeks specific performance of the Manufacturing License Agreement and asserts that all of the necessary conditions are met.  Defendants, however, argue that bringing specific performance as a distinct claim is improper because in New York "'specific performance is an equitable *remedy* for a breach of contract rather than a separate cause of action.'"  *Mariah Re Ltd. v. Am. Fam. Mut. Ins. Co.*, 52 F. Supp. 3d 601, 619 n.7 (S.D.N.Y. 2014) (emphasis added) (granting motion to dismiss specific performance cause of action); *Khurana v. Wahed Inv., LLC*, No. 18 Civ. 233 (LAK) (BCM), 2020 WL 364794, at *10 (S.D.N.Y. Jan. 8, 2020) (same).  Defendants also state that they are not moving to strike the remedy of specific performance.  *See* Doc. 58 at 14, n. 7.

In response, Plaintiff argues that New York courts recognize stand-alone specific performance claims.  *See* Doc. 51 at 24.  Indeed, "the Court of Appeals has recognized that 't[h]ere is no inconsistency between an action for specific performance and an action for breach

---

[19] Because the Court has determined that the FAC has not alleged actual breach, it need not consider Defendants' other argument:  that ThreeSixty's conduct was justified.  *See* Doc. 48 at 25.

of contract, both being affirmance of the contract.'" *Trodale Holdings LLC v. Bristol Healthcare Investors, L.P.*, No. 16 Civ. 4254 (KPF) 2017 WL 5905574, at *11 (S.D.N.Y. Nov. 29, 2017) (quoting *Judnick Realty Corp. v. 32 West 32nd Street Corp.*, 61 N.Y.2d 819, 823 (1984)).  These cases, however, tend to involve disputes over real property.  *See, e.g.*, *City Ownership v. Giambrone*, 772 N.Y.S.2d 870, 870–71 (2d Dep't 2004) (affirming denial of summary judgment on cause of action for specific performance of a contract for the sale of real property).

In breach of contract cases like the instant case, courts typically dismiss stand-alone specific performance claims but permit, without prejudice, plaintiff to seek specific performance as a remedy for the breached contract.  *See, e.g.*, *Khurana*, 2020 WL 364794, at *10; *RJ Capital, S.A. v. Lexington Capital Funding III, Ltd.*, No. 10 Civ. 25 (PGG), 2011 WL 3251554, at *16 (S.D.N.Y. July 28, 2011) (dismissing plaintiff's separately-pleaded claim for specific performance without making any "finding as to whether specific performance is warranted as a remedy"); *Lorterdan Properties at Ramapo I, LLC v. Watchtower Bible & Tract Soc'y of New York, Inc.*, No. 11 Civ. 3656 (CS), 2012 WL 2873648, at *9 (S.D.N.Y. July 10, 2012) (dismissing plaintiff's request for "specific performance or an injunction" without prejudice to plaintiff's ability to request those remedies "at a future date" in connection with its breach of contract claim); *Tierney v. Omnicom Group Inc.*, No. 06 Civ. 14302 (LTS) (THK), 2007 WL 2012412, at *10 ("Defendant's motion to dismiss plaintiff's claim of specific performance is granted without prejudice to plaintiff's ability to request the remedy of specific performance in connection with any of his other surviving claims.").  The Court, here, will follow suit.

Accordingly, Count VIII of the FAC is dismissed without prejudice to Camelot's ability to pursue specific performance as a remedy if it ultimately succeeds on its breach of contract claim.

### f.   Leave to Amend

Camelot requests leave to amend its complaint to address any deficiencies found by the Court.  FRCP 15 instructs courts to "freely give leave [to amend a pleading] when justice so requires."  Fed. R. Civ. P. 15(a)(2).  The Second Circuit has instructed courts not to dismiss a complaint "without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated."  *Shabazz v. Bezio*, 511 F. App'x 28, 31 (2d Cir. 2013) (quoting *Shomo v. City of New York*, 579 F.3d 176, 183 (2d Cir. 2009)). In *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, the Second Circuit reaffirmed the "liberal spirit" of FRCP 15 and counseled strongly against the dismissal of claims with prejudice prior to "the benefit of a ruling" that highlights "the precise defects" of those claims.  797 F.3d 160, at 190–91 (quoting *Williams v. Citigroup Inc.*, 659 F.3d 208, 214 (2d Cir. 2011) (per curiam)).  An amendment is futile and should not be granted if it "fails to cure prior deficiencies."  *Chunn v. Amtrak*, 916 F.3d 204, 208 (2d Cir. 2019) (quotation and citation omitted).

The Court dismissed Counts I and II because ThreeSixty is the owner of the Trademarks, and Camelot failed to plead an ownership interest in them or, relatedly, that Defendants' practices could cause confusion as to the Trademarks' origin, in this case, ThreeSixty.  These Counts are dismissed with prejudice.  The Court has also dismissed Count VIII without prejudice to Camelot's capacity to seek special performance as a remedy.

The Court finds that a valid claim might yet be stated for Counts III and IV against ThreeSixty and MerchSource.  Accordingly, subject to the discussion of jurisdiction below, Camelot is granted leave to amend them.

### g.  Jurisdiction

Having dismissed with prejudice Count I, the FAC no longer involves a cause of action arising under federal law; by consequence, the Court presumptively no longer has jurisdiction. When a court dismisses all of the claims over which it has original jurisdiction, it may decline to exercise jurisdiction over any non-federal claims over which it could have exercised supplemental jurisdiction.  Subject matter jurisdiction in the instant action is based on federal question jurisdiction.  28 U.S.C. § 1331.  Having dismissed all of Camelot's federal claims under FRCP 12(b)(6), it would be inappropriate to adjudicate its state law claims.  *See United Mine Workers v. Gibbs,* 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial . . . the state claims should be dismissed as well."); *McGugan v. Aldana-Bernier*, No. 11 Civ. 00342 (TLM), 2012 WL 1514777 (E.D.N.Y. Apr. 30, 2012) ("[W]hen all federal claims are eliminated in the early stages of litigation, the balance of factors generally favors declining to exercise pendent jurisdiction over remaining state law claims and dismissing them without prejudice.").

In their counterclaims, however, Defendants allege that complete diversity exists.  But Camelot and each of the defendant companies are LLCs.  Moreover, the single member of Camelot is itself an LLC, the citizenship of whose members must be identified in order to determine whether diversity exists.  In addition, the parties do not state the citizenship of persons who are members of MerchSource.  The citizenship of an LLC is determined by the citizenship of each of its members.  *See Bayerische Landesbank*, 692 F.3d at 49.  "A complaint premised

upon diversity of citizenship must allege the citizenship of natural persons who are members of a limited liability company and the place of incorporation and principal place of business of any corporate entities who are members of the limited liability company." *New Millennium Capital Partners, III, LLC v. Juniper Grp. Inc.*, No. 10 Civ. 46 (PKC), 2010 WL 1257325, at *1 (S.D.N.Y. Mar. 26, 2010) (citing *Hanadelsman v. Bedford Village Associates Ltd. Partnership*, 2013 F.3d 48, 51–52 (2d Cir. 2000)).

Defendants also allege that federal question jurisdiction exists over their counterclaims because certain of their counterclaims arise under Latham Act or Declaratory Judgment Act.  As noted, however, the FAC no longer involves any causes of action arising under federal law.  The parties are therefore directed to file a written submission by October 14, 2022 alerting the Court to:  (1) the citizenship of the members of Camelot Venture Group, LLC and MerchSource LLC; and (2) whether, in the alternative, the Court has federal question jurisdiction over Defendants' counterclaims, despite having dismissed the federal cause of action alleged in the FAC.

In the absence of diversity or federal question jurisdiction over the counterclaims, the Court will dismiss the balance of the complaint without prejudice.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' partial motion to dismiss is GRANTED.  The Clerk of Court is respectfully directed to terminate the motion, Doc. 47, and related motions, Doc. 49 and Doc. 50.

It is SO ORDERED.

Dated:    September 30, 2022
          New York, New York

_____

Edgardo Ramos, U.S.D.J.